UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASHRAF KHODEIR, RASHA ELGAHSH, individually and on behalf of minor children A.K., M.K., AH.K., and AD.K., | Civ. _____ |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| v. | |
| MARWAN SAYYED, SUBHI SAYYED | |
| Defendants. | |

Plaintiffs Ashraf Khodeir and Rasha Elgahsh, by their undersigned attorneys, Paul,

Weiss, Rifkind, Wharton & Garrison LLP and The Bronx Defenders, and on behalf of Infant

Plaintiffs A.K., M.K., Ah.K., and Ad.K., respectfully allege as follows:

## NATURE OF THE ACTION

1.     Between February 2014 and November 2014, Defendants, acting as Plaintiffs'

landlords, discriminated against Plaintiffs on the basis of Plaintiffs' family status. Defendants

denied Plaintiffs essential services within the apartment they rented to Plaintiffs, and subjected

Plaintiffs to verbal and physical assault and harassment.  What is more, in November 2014

Defendants unlawfully entered the Plaintiffs' home, evicted them illegally, and wantonly

destroyed their property, causing Plaintiffs immense mental anguish and substantial economic

loss.

2.     Plaintiffs seek to recover damages for unlawful discrimination in violation of the

Fair Housing Act.  In addition, Plaintiffs seek damages for unlawful entry and eviction under

Section 853 of the New York Real Property Actions and Proceedings Law, conversion, nuisance,

1

breach of the warranty of habitability, malicious prosecution, fraud, and intentional infliction of emotional distress.

## THE PARTIES

3.      Plaintiff Ashraf Khodeir ("Mr. Khodeir") was formerly a tenant-of-record at 2150 Chatterton Avenue, Apartment 1R, in the County of Bronx, City and State of New York ("the premises"). Mr. Khodeir resided at the premises with his family, including, but not limited to, the following: Plaintiff Rasha Elgahsh, Mr. Khodeir's wife; A.K., Mr. Khodeir's daughter; M.K., Mr. Khodeir's son; Ah.K., Mr. Khodeir's son; and Ad.K., Mr. Khodeir's son. Mr. Khodeir moved into the premises in or around early February 2014 pursuant to a written lease between Defendant Subhi Sayyed as putative landlord and Mr. Khodeir and Ms. Elgahsh as tenants, and resided there through October 2014. Mr. Khodeir currently resides with his family in Queens County, New York. He appears in this action by the undersigned attorneys.

4.      Plaintiff Rasha Elgahsh ("Ms. Elgahsh"), the wife of Mr. Khodeir, was also a tenant-of-record at the premises. Ms. Elgahsh moved with Mr. Khodeir and their children into the premises in or around early February 2014 and signed a lease between Defendant Subhi Sayyed as putative landlord and Mr. Khodeir and Ms. Elgahsh as tenants. As described below, Ms. Elgahsh and her children were forcibly and illegally evicted from the premises on or around November 27, 2014. Ms. Elgahsh appears in this action by the undersigned attorneys.

5.      Plaintiffs A.K., M.K., Ah.K., and Ad.K. ("Infant Plaintiffs") are the minor children of Mr. Khodeir and Ms. Elgahsh, whose names are reduced to initials here pursuant to Fed. R. Civ. P. 5.2(a)(3). At the time of the actions complained of herein, the Infant Plaintiffs were the following ages: twelve years old (A.K.), nine years old (M.K.), three years old (Ah.K.),

2

and two years old (Ad.K.).  Pursuant to Fed. R. Civ. P. 17(c)(1)(a), Mr. Khodeir and Ms. Elgahsh sue on behalf of Infant Plaintiffs.

6.      Mr. Khodeir, Ms. Elgahsh, and their children are referred to herein as "the Khodeir Family" or "Plaintiffs."

7.      Defendant Marwan Sayyed ("Marwan Sayyed") is the current titleholder of the premises and has held title to 2150 Chatterton Avenue, County of Bronx, City and State of New York ("the building") since in or around November 2013.  Marwan Sayyed resides at 109 Breakers Lane, City of Stratford, State of Connecticut.

8.      Defendant Subhi Sayyed ("Subhi Sayyed") is the father of Marwan Sayyed, and acted as his agent during the relevant time period, including by exercising day-to-day control over the building.  Such control included, but was not limited to, authority to lease apartments within the building on behalf of Marwan Sayyed, the authority to order and perform necessary repairs to the building, and the authority to collect rent from tenants residing in the building. Subhi Sayyed formerly held title to the building, and he is the last person registered with the New York City Department of Housing Preservation and Development as the building's managing agent.  Upon information and belief, Subhi Sayyed performed the complained-of actions on behalf of, and with the knowledge or acquiescence of, Marwan Sayyed.  Subhi Sayyed resides at 2110 Watson Avenue, County of Bronx, City and State of New York.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to the Fair Housing Act, 42 U.S.C. § 3601 et seq., 42 U.S.C. §§ 3604 and 3617, and 28 U.S.C. § 1331.

10.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in the Southern District of New York.

## FACTUAL BACKGROUND

### Ownership and Regulatory Status of the Building

12.     Subhi Sayyed was the record owner of the building from on or around September 22, 1988, until on or around November 13, 2013, at which point he conveyed the building to Marwan Sayyed by quitclaim deed.

13.     The building contains four legal dwelling units and is therefore a multiple dwelling as defined by the Multiple Dwellings Law ("MDL") § 4(7).  Nevertheless, it has not been registered with the New York City Department of Housing Preservation and Development ("HPD") since on or around September 15, 2013, as required annually by MDL § 301.

14.     Shortly after moving into the building, Mr. Khodeir and Ms. Elgahsh became aware of a fifth dwelling unit located in the basement of the premises.  Upon information and belief, that unit is not permitted by the current Certificate of Occupancy for the building on file with the New York City Department of Buildings.

### The Tenancy of Mr. Khodeir and Ms. Elgahsh

15.     Mr. Khodeir and Ms. Elgahsh became aware that the premises were available to rent through information provided to them by a friend.  When Mr. Khodeir and Ms. Elgahsh first approached the building on or around January 20, 2014, when they were looking for an apartment, they observed a sign outside stating, "Apartment for Rent" with a description of the premises and the phone number of Subhi Sayyed.

4

16.    When Mr. Khodeir and Ms. Elgahsh spoke with Subhi Sayyed about the apartment, he told them, "I am the owner of the house." In so doing, Subhi Sayyed held himself out as the landlord and owner of the building, giving Mr. Khodeir and Ms. Elgahsh the impression that he had full authority to rent the premises to them.

17.    Mr. Khodeir and Ms. Elgahsh were unaware that title to the premises, upon information and belief, was actually held by Marwan Sayyed.

18.    The monthly rent was $1,400.00.

19.    Prior to moving into the premises, Mr. Khodeir and Ms. Elgahsh paid Subhi Sayyed $4,200.00, which was the equivalent of rent for two months as a security deposit plus rent for February 2014. In exchange, Subhi Sayyed gave Mr. Khodeir and Ms. Elgahsh keys to the premises on or around January 25, 2014.

20.    Mr. Khodeir and Ms. Elgahsh moved into the premises with their children in or around February 2014.

21.    Less than seven days after moving into the premises, Mr. Khodeir and Ms. Elghash entered into a written rental contract for the premises at the monthly rate of $1,400.00, effective February 1, 2014. Mr. Khodeir and Ms. Elgahsh understood the contract to be a twelve-month lease for the period of February 1, 2014 through and including January 31, 2015. Subhi Sayyed initially described the lease to Mr. Khodeir and Ms. Elgahsh in Arabic as a one-year rental agreement.

22.    The lease agreement was drafted and executed in English. Mr. Khodeir and Ms. Elgahsh, however, are recent Egyptian immigrants to the United States and speak Arabic. Ms. Elgahsh has an extremely limited ability to read and speak English, and Mr. Khodeir cannot read

or speak English.  Subhi Sayyed is also an Arabic speaker, but has a working command of English.

23.     Oral communications between Mr. Khodeir, Ms. Elgahsh, and Subhi Sayyed always took place in Arabic.  Subhi Sayyed never provided Mr. Khodeir and Ms. Elgahsh an Arabic translation of the lease, nor did he ever retract his statements that the lease was for a one-year term.  He also never presented Mr. Khodeir or Ms. Elgahsh with a copy of the lease agreement after it was signed by the parties.

24.     Throughout the Khodeir Family's tenancy, Subhi Sayyed demanded that rent be paid in cash only.  Subhi Sayyed refused to accept any form of payment other than cash.  He also refused to issue receipts for rent paid by Mr. Khodeir and Ms. Elgahsh even when Mr. Khodeir specifically requested receipts.

### Subhi Sayyed Harassed and Made Initial Attempts
### To Force the Khodeir Family to Vacate the Premises

*i. Subhi Sayyed Demanded the Khodeir Family Vacate the Premises*

25.     On or around February 14, 2014, when the Khodeir Family moved into the premises, Subhi Sayyed became aware of the fact that Mr. Khodeir and Ms. Elgahsh would be residing there with their four children.

26.     When Subhi Sayyed became aware that Mr. Khodeir and Ms. Elgahsh had four children who were residing at the premises, he began to demand that the Khodeir Family move out.  Specifically, Subhi Sayyed stated that it was "illegal" for them to live in the premises with four children and for Ad.K., then two years old, to sleep in the same room as his parents.  Subhi Sayyed also complained about costly water bills, which he claimed would be caused by the number of people residing at the premises.

27.     Ms. Elgahsh's mother was also temporarily visiting from Egypt and stayed with the family for a time in February 2014.  On or around February 21, 2014, Subhi Sayyed demanded that Ms. Elgahsh's mother vacate the premises and take Mr. Khodeir and Ms. Elgahsh's youngest son, Ad.K., and their daughter, A.K., with her to Egypt.

*ii.  Subhi Sayyed Verbally and Physically Abused the Khodeir Family*

28.     Subhi Sayyed verbally abused the Infant Plaintiffs regularly, beginning in or around May 2014, until the Khodeir Family was illegally evicted in November 2014.  During that period, Subhi Sayyed accosted the Infant Plaintiffs, particularly A.K. and M.K., when they were outside the building taking out the garbage.  He demanded that they vacate the premises and asked them why they had not found another apartment in which to live.  During at least one of these encounters, Subhi Sayyed told A.K. and M.K., "I hate you."  Subhi Sayyed also told the Infant Plaintiffs that they "better tell [their] father to move."

29.     Subhi Sayyed also harassed Mr. Khodeir on at least one occasion in or around May 2014.  He told Mr. Khodeir that if Mr. Khodeir did not want to "leave with dignity," then Subhi Sayyed would "take" Mr. Khodeir's "dignity away."

30.     Beginning in or around June 2014, Subhi Sayyed also became physically aggressive with the Infant Plaintiffs.  On a number of occasions when Subhi Sayyed observed the Infant Plaintiffs, particularly A.K. and M.K., outside the building taking out the garbage or walking home from school, Subhi Sayyed chased them, threw garbage at them, and otherwise harassed and menaced them.  On at least one occasion, Subhi Sayyed physically struck M.K. in the face with an open hand.  Subhi Sayyed also repeatedly locked the Infant Plaintiffs out of the house while they were taking out the garbage.

*iii.  Subhi Sayyed Intercepted the Khodeir Family's Mail*

31.     During the Khodeir Family's tenancy, Subhi Sayyed also used a copy of the key to the mailbox of the premises to inspect and intercept mail addressed to Mr. Khodeir and Ms. Elgahsh.  Ms. Elgahsh noticed that some of the envelopes that they should have received by mail in her mailbox were placed on her front door instead.  They also did not receive utility bills in the mail for several months.

32.     On at least one occasion in or around April or May 2014, Ms. Elgahsh observed Subhi Sayyed opening the locked mailbox assigned to the premises and retrieving mail addressed to various members of the Khodeir Family from their mailbox.

*iv.  Subhi Sayyed Refused to Make Repairs to the Premises in an*
*Effort to Force the Khodeir Family to Vacate*

33.     In or around April 2014, because of a leak that originated in apartment 2R— directly above the premises—the bathroom ceiling in the premises partially collapsed.  This created a large hole in the ceiling that exposed the space between the first and second story of the building where the pipes were.  The leak through the ceiling also caused damage to the floor of the bathroom in the premises, resulting in a large hole in the wooden floor.  Because of the holes in the ceiling and the floor, the premises became infested with cockroaches, mice, and other vermin, causing the Infant Plaintiffs to feel afraid to use the bathroom.

34.     Ms. Elgahsh complained frequently to Subhi Sayyed about the holes in the bathroom ceiling and floor, but he refused to fix the holes.  Subhi Sayyed told Ms. Elgahsh that he would not make the repairs until the Khodeir Family moved out.  He recommended that, in the meantime, the Khodeir Family use an umbrella when they were in the bathroom to avoid getting wet from the leak.

35.     What is more, according to an inspection conducted by HPD in November 2014, at least one area in the foyer of the premises was coated with lead-based paint, which had begun to peel.  Although Defendants knew or should have known of this condition, and were aware or should have been aware of the presence of young children in the premises, Defendants did not take action to correct this dangerous violation.

*v.  Subhi Sayyed Turned Off the Heat and Hot Water in the Premises*

36.     Beginning in or around March 2014, the premises no longer had consistent heat. The heat was on only for two hours during the day and was shut off entirely during the night.  On several occasions, Mr. Khodeir and Ms. Elgahsh observed that heat was present in other parts of the building, but not within their apartment.

37.     Beginning in or around March 2014, the hot water supply to the subject premises dwindled and became sporadic.  Typically, hot water was supplied only between the hours of 5:00 PM and 7:00 AM.  Often there was no hot water at all in the Khodeirs' home for days at a time.  In or around October 2014, the hot water supply to the Khodeirs' home was cut off completely and was not restored.

38.     Mr. Khodeir and Ms. Elgahsh asked Subhi Sayyed to fix the heat and the hot water.  They explained that their children needed the heat and hot water, and that they were getting sick from not having these basic necessities.

39.     Subhi Sayyed refused to fix the heat or hot water at the premises.  He stated, incorrectly, that the law required him to have the heat on for only twelve hours a day.  Subhi Sayyed further stated to the Khodeir Family in response to their complaints, "If you don't like this apartment, find a better one."

9

**Subhi Sayyed Harassed the Khodeir Family**
**By Filing a Non-Payment Action in Housing Court**

40.     When the Khodeir Family failed to vacate the premises, Subhi Sayyed initiated a spurious non-payment action against Mr. Khodeir and Ms. Elgahsh in Bronx County Housing Court on or around July 28, 2014.

41.     In the Verified Petition for Non-Payment ("Petition"), which Subhi Sayyed filed by counsel, Subhi Sayyed asserted that Mr. Khodeir and Ms. Elgahsh had occupied the premises pursuant to a written lease.

42.     In the Petition, Subhi Sayyed asserted that he was the landlord and owner of the building, and that the building was properly registered with HPD.  As noted above, however, Subhi Sayyed knew that those assertions were false.

43.     Subhi Sayyed further asserted in the Petition that Mr. Khodeir and Ms. Elgahsh had failed to pay rent for the months of April 2014, May 2014, June 2014, and July 2014.

44.     Mr. Khodeir and Ms. Elgahsh had indeed paid rent for every month in which rent was alleged to be due.  However, because Subhi Sayyed insisted that rent payments be made in cash, and because he refused to issue receipts for the rent payments he received, Mr. Khodeir and Ms. Elgahsh had no physical acknowledgement by Subhi Sayyed of rent payment.

45.     On August 12, 2014, Subhi Sayyed's process server attempted to effect service of the Petition on Mr. Khodeir and Ms. Elgahsh.

46.     Because the Notice of Petition was in English, Mr. Khodeir and Ms. Elgahsh did not understand that they needed to answer the pleadings affirmatively in order to be assigned a court date.  Mr. Khodeir and Ms. Elgahsh continued to wait to be notified by the Housing Court of the court date.

47.     On or around August 28, 2014, Subhi Sayyed sought a default judgment of possession against Mr. Khodeir and Ms. Elgahsh.  The Housing Court, however, rejected this application on the basis of improper paperwork.

48.     On or around September 29, 2014, Subhi Sayyed again attempted to obtain a default judgment of possession against Mr. Khodeir and Ms. Elgahsh.  On or around September 30, 2014, as a part of the default judgment process in Housing Court, Subhi Sayyed filed at least one affidavit swearing that he was "the owner of the subject premises."

49.     On or around October 27, 2014, the Housing Court entered a default judgment in favor of Subhi Sayyed, and on or around November 6, 2014, the Court issued a warrant of eviction against the Khodeir Family to City Marshal Danny Weinheim.

50.     On or around November 20, 2014, Marshal Weinheim served the Khodeir Family with a Notice of Eviction.

51.     By this time, the Khodeir Family had retained counsel at The Bronx Defenders. On November 24, 2014, Mr. Khodeir, by his attorneys, filed a motion by Order to Show Cause in Housing Court requesting that the non-payment proceeding be dismissed, *inter alia*, for lack of standing on the part of Subhi Sayyed.  The Housing Court signed the Order to Show Cause and, as a result, issued a temporary restraining order staying execution of the warrant of eviction pending argument of the Motion, which was made returnable December 12, 2014.

52.     On April 7, 2015, after several procedural adjournments, Mr. Khodeir's Motion was granted by the Hon. Kimon Thermos, Housing Court Judge, who found that Subhi Sayyed did not own the building and therefore lacked standing to commence the non-payment proceeding.

**Subhi Sayyed Refused to Grant Access to Con Ed**
**to Restore the Electricity Supply to the Premises**

53.     On or around October 30, 2014, Consolidated Edison ("Con Ed"), the electrical

utility servicing the premises, terminated electricity at the premises for non-payment of the utility

bill.

54.     Mr. Khodeir and Ms. Elgahsh had not received a utility bill for two months.  This

failure to receive utility bills was caused, upon information and belief, by Subhi Sayyed using his

extra mailbox key to intercept Plaintiffs' utility bills.

55.     When electrical service to the premises was terminated, Ms. Elgahsh immediately

contacted Con Ed and paid the delinquent bill by credit card over the phone.

56.     In early November 2014, Con Ed attempted to send technicians to the building on

three or four occasions to restore service immediately after the power went out, but Subhi

Sayyed refused to allow them access to the basement, where the electricity meter and breaker

box were located.  Ms. Elgahsh also called the police, who came to the premises and attempted

to contact Subhi Sayyed, who stated he was not there and would not permit anyone to enter the

basement.  As a result, the premises remained without electricity for the remainder of November

2014.

57.     On or around November 17, 2014, Ms. Elgahsh called HPD  about the termination

of electrical service.  An agent of HPD inspected the premises and found the electricity was

disconnected.

58.     Because Subhi Sayyed refused to grant Con Ed technicians access to restore

electricity, the premises were unfit for human habitation due to the lack of electrical power.  The

Khodeir Family was forced to bathe, sleep, and stay in a hotel for several days, and was therefore

constructively evicted from the premises.

59.    At no time did the Khodeir Family communicate to Subhi Sayyed that they intended to vacate or abandon the premises. Their possessions remained in the premises and the Khodeir Family retained the keys to the premises.

60.    Further confirming their intent to continue residing at the premises, on or around November 25, 2014, Mr. Khodeir and Ms. Elgahsh's attorneys, The Bronx Defenders, began to prepare an emergency action in Housing Court seeking an order to restore electrical service to the premises. Because of the events described below, however, The Bronx Defenders were unable to file that action.

### The Illegal Lockout and Destruction of the Family's Possessions

61.    On November 28, 2014, Ms. Elgahsh and her children returned to the premises after a three or four day stay at a hotel to find that the locks on the front door of the premises had been changed.

62.    There was no indication on the door of the premises or elsewhere that the City Marshal had returned legal possession of the premises to either of the Defendants.

63.    Ms. Elgahsh immediately called her attorneys and 911 to gain access to the premises. Police Officer Gonzalez, Shield No. 17299, of the 43rd Precinct and a second officer responded to the 911 call.

64.    Officer Gonzalez determined that there was no indication of forced entry into the premises.

65.    Officer Gonzalez contacted City Marshal Weinheim to verify that no legal eviction had occurred. Marshal Weinheim informed Officer Gonzalez that a stay of eviction was in effect due to Mr. Khodeir's Order to Show Cause, described above, and that the Marshal had therefore not performed any eviction.

13

66.     Officer Gonzalez then contacted a locksmith from Excel Locksmith Services to remove the lock.

67.     While the Khodeir Family and Officer Gonzalez waited for the locksmith to arrive, M.K. walked around the premises to throw his juice container in the dumpster located behind the building.  When M.K. returned to join his family waiting at the front of the building, he was crying.  Ms. Elgahsh asked M.K. what was wrong and tried to comfort him, but M.K. was crying too hysterically to explain.  Ms. Elgahsh then walked to back of the building with Officer Gonzalez to investigate what had made her son cry.

68.     When Ms. Elgahsh reached the back of the building, she was shocked.  She saw the family's possessions slashed, destroyed, and discarded in and around the dumpster.  She saw, for example, the skateboard that she had given her son M.K. and the doll she gave her daughter A.K. for their birthdays, both broken and lying near the dumpster.

69.     Ms. Elgahsh was in shock and speechless when she saw all of her family's possessions, including these special family gifts, damaged and made unusable.  The Infant Plaintiffs also cried and felt panicked.  Ms. Elgahsh was so upset that she was unable to speak with Officer Gonzalez to explain what had happened.  The Infant Plaintiffs tried to explain the situation to Officer Gonzalez, but had trouble doing so because they were crying uncontrollably as well.

70.     The locksmith arrived at the premises shortly thereafter and removed the lock. When Ms. Elgahsh entered the premises, she found them to be completely empty.  Upon information and belief,  Officer Gonzales also observed that the premises were empty and that the Khodeir Family's possessions were destroyed and discarded near the dumpster behind the building.

14

71.     The possessions that the Khodeir Family lost included cash, electronic devices (tablets, smartphones, televisions, computer), home furnishings (rugs, kitchen appliances, mattresses, couches), clothing, jewelry, and food.  The total value of these possessions at the time of their destruction was at least $20,725.00.

72.     The Khodeir Family had insufficient funds to purchase a replacement lock for the premises.  Therefore, the door to the premises was left unsecured, and the Khodeir Family was unable to remain there.

73.     Because of the loss of their possessions, the fact that there was no electricity, and there was no working lock on the front door of the premises, the Khodeir Family was forced to secure another apartment.

74.     The Khodeir Family spent roughly ten days sleeping on blankets and air mattresses on the bare floor of the new apartment before they were able to purchase basic items, such as blankets, bed linens, curtains, and food, at a cost of at least $1,100.00.

75.     Defendants were the only persons able to enter the premises and remove and destroy the possessions therein without breaking the locks.

76.     Upon information and belief, Defendants possessed keys to the premises, and utilized those keys to access the premises on or around November 28, 2014, with the purpose of illegally evicting the Khodeir Family.

## FIRST CAUSE OF ACTION

### UNLAWFUL DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT

77.     Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

78.     Pursuant to 42 U.S.C. § 3604(b), it is unlawful to discriminate against any person in the terms, conditions, or privileges, or in the provision of services or facilities in connection with, the sale or rental of a dwelling because of family status.

79.     Defendants have a duty to apply all terms, conditions, and privileges of the rules and regulations in a nondiscriminatory manner.

80.     Defendants violated 42 U.S.C. § 3604(b) when they demanded that Plaintiffs move out of the premises because of the number of children residing there.  Defendants made clear throughout the Khodeir Family's tenancy that they strongly objected to the number of children residing at the premises.

81.     Defendants further made clear throughout the Khodeir Family's tenancy that the family's size was the primary reason Defendants failed to provide necessary maintenance to Plaintiffs and/or provided substandard maintenance to Plaintiffs' rental unit, including by refusing to repair the hole in the premises' bathroom ceiling and floor and refusing to grant access to Con Ed to restore electricity.

82.     Defendants violated 42 U.S.C. § 3617 by harassing and intimidating Plaintiffs by demanding that they vacate the premises multiple times by verbally insulting and hitting Infant Plaintiffs with garbage.

83.     As a result of Defendants' actions, Plaintiffs suffered grievous harm and damages including but not limited to monetary damages and emotional suffering.

## SECOND CAUSE OF ACTION

### UNLAWFUL ENTRY AND EVICTION

84.     Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

16

85.     Defendants unlawfully entered the premises and evicted the Khodeir Family on or around November 27, 2014.  Such entry and eviction was unlawful because it violated statutes including, but not limited to, N.Y.C. Admin. Code § 26-521(a)(1), (2), and/or (3).  Plaintiffs had been in lawful possession of the premises for over thirty (30) days, and therefore are subject to the protections of this statute.

86.     What is more, Defendants entered the premises themselves, without the use of a New York City Marshal, and did so during a period in which all eviction proceedings had been stayed by Order of the Bronx County Civil Court, Housing Part, Hon. Kimon Thermos.  Defendants knew or should have known of this stay, as Defendant Subhi Sayyed's attorney had been duly served with a copy of Plaintiffs' Order to Show Cause.

87.     Having effected such unlawful entry, Defendants proceeded to remove Plaintiffs' possessions from the premises in such a way that said possessions were irreparably damaged or lost.  The total value of the possessions so removed, destroyed, lost, converted, or misappropriated by Defendants is not less than $20,725.00.

88.     Having effected such unlawful entry, Defendants further proceeded to remove the existing locks from, and to install new locks to, the front door of the premises, preventing Plaintiffs from returning.  Defendants did not provide the Khodeir Family with the new keys.

89.     Defendants' actions were depraved and indifferent to human life and suffering, and placed Mr. Khodeir, Ms. Elgahsh, and their four minor children in grave risk of harm by casting them onto the street during one of the coldest winters in recent memory.  Defendants' actions further deprived the Khodeir Family of the vast majority of their worldly possessions, including, but not limited to, warm clothing, bedding, and other items necessary to sustain life, health, and hygiene.

17

90.     Because of Defendants' unlawful eviction of Plaintiffs, Plaintiffs were forced to incur reasonable expenses in locating interim food and shelter, in the amount of at least $1,100.00.  Further, because their possessions were destroyed, converted, or misappropriated by Defendants, Plaintiffs were forced to purchase furniture, clothing, and other items to replace what they had lost to Defendants' wanton, outrageous, and flagrant breach of the law.

### THIRD CAUSE OF ACTION

### CONVERSION

91.     Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

92.     Plaintiffs are the sole and rightful owners of all of the belongings located in the premises, including but not limited to cash, electronic devices, clothing, food, and household furnishings.

93.     These belongings were destroyed and removed from the premises in November 2014, while Plaintiffs were still the tenants at the premises.

94.     Defendants were the only individuals other than Plaintiffs who had access to the premises and the ability to change the locks because they were the only individuals with keys to the premises.

95.     Defendants therefore intentionally entered the premises while Plaintiffs were briefly absent and exercised unauthorized control and dominion of Plaintiffs' possessions by slashing and disposing of said property.

96.     As a result of the foregoing, Defendants have converted Plaintiffs' personal property, in reckless and willful disregard of Plaintiffs' superior possessory rights.

## FOURTH CAUSE OF ACTION

### NUISANCE

97.     Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

98.     Defendants intentionally interfered with Plaintiffs' right to use and enjoy the premises when Defendants verbally and physically abused the Infant Plaintiffs while they were taking out the garbage, intercepted Plaintiffs' mail, refused to repair the holes in the bathroom ceiling and floor of the premises, refused to grant access to Con Ed to restore electricity to the premises, illegally locked Plaintiffs out of the premises, and destroyed and removed Plaintiffs' personal property from the premises.

99.     Defendants, through these foregoing wrongful acts, have intentionally and unreasonably caused substantial interference with Plaintiffs' right to use and enjoy the premises.

100.    As a result of Defendants' creation of a private nuisance by the foregoing actions, Plaintiffs have been injured and have suffered injuries for which there is no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### BREACH OF WARRANTY OF HABITABILITY

101.    Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

102.    Pursuant to New York Real Property Law § 235-b, a residential tenant's obligation to pay rent is contingent upon a landlord's satisfactory maintenance of the premises in a habitable condition.

103.    Under New York Real Property Law § 235-b, a habitable condition means that occupants "shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety."

104.    Defendants violated New York Real Property Law § 235-b by failing to provide heat, electricity, and hot water in the premises, as well as by failing to repair the leak and holes in the premises' bathroom ceiling and floor, which created a hazardous situation for the Khodeir family and allowed insects and vermin to enter the premises.

105.    Defendants also violated New York Real Property Law § 235-b, New York Multiple Dwelling Law § 78, and/or Title 28, Chapter 11 of the New York City Administrative Code, by failing to remove lead paint from the premises, particularly because children were residing at the premises.

106.    As a result of Defendants' actions, Plaintiffs overpaid in rent for the entire term of their lease, and suffered grievous harm and additional damages including but not limited to monetary damages and emotional suffering.

## SIXTH CAUSE OF ACTION

## MALICIOUS PROSECUTION

107.    Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

108.    Subhi Sayyed commenced a spurious non-payment action against Mr. Khodeir and Ms. Elgahsh in Bronx County Housing Court on or around July 28, 2014.

109.    The non-payment action was decided in favor of Mr. Khodeir and Ms. Elgahsh. On April 7, 2015, Mr. Khodeir's Motion to dismiss the action was granted by the Hon. Kimon

Thermos, Judge, Housing Court.  The Court found that Defendant Subhi Sayyed did not own the premises and therefore lacked standing to commence the non-payment proceeding.

110.    There was no lawful basis or cause for Subhi Sayyed's non-payment action in Housing Court.  As described above, Subhi Sayyed lacked standing to commence such action. Additionally, due to Defendants' failure to properly register the building, pursuant to MDL § 302, no action for non-payment of rent could lawfully be maintained by Defendants until that defect had been cured.

111.    What is more, Mr. Khodeir and Ms. Elgahsh had indeed paid rent for each and every month for which rent was alleged to be due and owing.

112.    Furthermore, Subhi Sayyed's swift request for a default judgment of possession against Mr. Khodeir and Ms. Elgahsh revealed that his interest was in Plaintiffs' eviction rather than payment of the monies allegedly owed to him.

113.    As described above, in seeking the default judgment, Subhi Sayyed repeatedly misrepresented his legal relationship to the premises, as well as the legal and regulatory status of the premises.

114.    Subhi Sayyed acted with actual malice in commencing the non-payment action. Subhi Sayyed commenced the non-payment action based on improper motive.  Subhi Sayyed did not commence the action to recover unpaid rent—indeed, as stated above, Mr. Khodeir and Ms. Elgahsh had already paid rent for each and every month for which rent was alleged to be due and owing.  Furthermore, Subhi Sayyed swiftly moved for a default judgment rather than waiting for payment.   Therefore, Subhi Sayyed commenced the non-payment action solely as an attempt to force Plaintiffs to vacate the premises, consistent with his earlier complaints concerning the number of children in the Khodeir Family and demands that they vacate the premises.

21

115.    Not only was the Khodeir Family harmed in their person and property when Subhi Sayyed illegally evicted them; they were also harmed by the spurious non-payment lawsuit. The Khodeir Family suffered a special injury from the non-payment action because their names now appear on at least one report by a "tenant screening bureau," known generally as the "tenant black list." These private companies record and report the names of tenants who are sued in Housing Court at the inception of summary eviction proceedings; no regard is taken of the end result of those matters. Thus, by virtue of having been sued wrongfully in a summary proceeding, Mr. Khodeir and Ms. Elgahsh have been irreparably injured and branded as problem-tenants, significantly reducing the likelihood they will be selected for apartments in the future. New York courts have recognized that appearing on this black list is an "irreparable injury" that will make it difficult, if not impossible, for the Khodeir Family to rent apartments in New York City in the future.

116.    As such, the tenant black list interferes significantly, and in a concrete manner, with the Khodeir Family's property. The harmful effect of the blacklist is substantially equivalent to the provisional remedy effect.

## SEVENTH CAUSE OF ACTION

### COMMON LAW FRAUD

117.    Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

118.    During communications with Plaintiffs, Defendant Subhi Sayyed made false and misleading oral statements concerning his status as the landlord of the premises and the legal status of the premises.

119.   These communications by Defendant Subhi Sayyed included, but are not limited to, Plaintiffs' initial conversation with Defendant Subhi Sayyed regarding the premises on or around January 20, 2014 when Subhi Sayyed said "I am the owner of the house"; Plaintiffs' conversations with Defendant Subhi Sayyed when they entered into a written rental contract and received the keys to the apartment on or around January 25, 2014; and the numerous occasions on which Plaintiffs and Defendant Subhi Sayyed interacted during the time Plaintiffs were tenants at the premises.  During all of these interactions, Defendant Subhi Sayyed  represented that he was the owner of the premises.

120.   As explained in detail above, Defendant Subhi Sayyed made this false representation regarding his status as owner and landlord to Plaintiffs with knowledge or belief that the representation was false.

121.   Defendant Subhi Sayyed's false representations or concealment induced Plaintiffs to rent the apartment and to remain in the apartment until they were unlawfully evicted on November 28, 2014.

122.   Plaintiffs justifiably relied upon Defendant Subhi Sayyed's false representations or concealment, which induced them to rent and remain at the premises from on or around January 25, 2014 until November 28, 2014.

123.   Subhi Sayyed continued to demand and accept rent from Plaintiffs even though the building was subdivided illegally under MDL §§ 301 and 302, and therefore no rent was collectible for the premises.  Furthermore, such unlawful subdivision subjected the entire building to potential adverse action, including an order to vacate.

124.   As a direct and proximate result of Defendant Subhi Sayyed's false and misleading statements, concealment, or omissions, Plaintiffs have suffered and continue to suffer economic and non-economic losses in an amount to be determined according to proof at trial.

## EIGHTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

125.   Plaintiffs incorporate by reference all foregoing allegations as if fully set forth herein.

126.   Defendants' actions, particularly their refusal to allow access to technicians from Con Ed in order to restore power to the premises, their illegal eviction of the Khodeir Family, and their destruction of the family's possessions, constituted a campaign of extreme and outrageous conduct.  Such conduct far exceeded all possible bounds of decency, particularly in view of the fact that Defendants knew the Khodeir Family had four minor children in the home. As set forth above, such conduct directly resulted in the deprivation of the Khodeir Family's one and only home, as well as their property, at the outset of one of the most brutal winters on record. Defendants engaged in this course of conduct without color of law, effecting an illegal deprivation of services and, ultimately, an extrajudicial eviction.

127.   There can be no question that Defendants engaged in the complained-of actions deliberately and maliciously.  Defendants knew the premises were still occupied by the Khodeir Family, and that the family included several minor children.  Nevertheless, Defendants affirmatively denied access to Con Ed's technicians, despite the attempted intervention of the New York City Police Department, on at least two occasions.  Defendants took further affirmative measures by entering the premises without permission, by changing the locks thereto

24

without supplying the Khodeir Family with new keys, and by removing and/or destroying all the family's possessions.

128.    As set forth above, Defendants' conduct was directed specifically at the Khodeir Family. The Khodeir Family were the sole occupants of the premises, and were the only persons affected by the loss of electrical power thereto.   The same is true of Defendants' wanton and outrageous conduct in unlawfully evicting the Khodeir family and removing their possessions from the premises.

129.    Defendants had knowledge of the probable consequences of their outrageous conduct. This is particularly so in the case of the Infant Plaintiffs, who Defendants knew would suffer emotional and physical harm from Defendants' illegal actions.  It is clear that the sudden and unlawful eviction of a two-year-old child, such as Plaintiff Ad.K., would have a tremendously detrimental impact on that child—not to mention on the child's parents.  To force a family of six to live for two weeks without electrical power, to deny them their one and only home, and to destroy nearly all their worldly possessions constitutes such gross invasions of personal rights that any reasonable person would reasonably perceive the consequences thereof.

130.    As set forth above, Defendants lacked all possible legal justification for their deplorable conduct.  Defendants knew, through the attorney of Subhi Sayyed, that the Housing Court had stayed all actions pertaining to the premises pending a hearing in that forum.  The illegal eviction of the Khodeir Family occurred before this hearing took place.  Further, the Housing Court eventually found that Subhi Sayyed lacked the proper standing to commence that action in the first place.  No legal grounds existed to deny access to Con Ed's service technicians in order to restore electrical service to the premises.  No legal grounds existed that allowed Defendants to remove, convert, and/or destroy the Khodeir Family's property.

131.    For the reasons set forth above, Defendants exhibited a conscious disregard of the basic rights of the Khodeir Family.

132.    Members of the Khodeir Family suffered severe emotional trauma as a result of Defendants' actions.  As set forth above, the Defendants' refusal to grant access to Con Ed caused Ms. Elgahsh and the Infant Plaintiffs to live without electricity for several weeks, which directly impacted the psychological wellbeing of the Khodeir Family as a whole.  Ms. Elgahsh and the Infant Plaintiffs were reduced to tears by the unlawful eviction and destruction of their property.  Further, Defendants' actions forced the Khodeir Family to spend the night at the premises in the cold, without electricity or even a lock on the apartment door.  This exposed the Plaintiffs to severe danger to their persons and health, and caused them to feel extreme fear for their safety.  The extent of the trauma caused by these events, particularly as regards the Infant Plaintiffs, was significant.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims in this action.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that the Court find for the Plaintiffs and enter a judgment jointly and severally against Defendants for the following relief:

1.   Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

2.   Awarding Plaintiffs treble damages in an amount to be determined at trial as permitted under R.P.A.P.L. § 853;

3.   Awarding Plaintiffs punitive damages in an amount to be determined at trial;

4.   Awarding Plaintiffs overpayment in rent in an amount to be determined at trial;

5. Awarding Plaintiffs prejudgment interest at the maximum rate allowable by law;

6. Awarding Plaintiffs reasonable attorneys' fees, together with the costs of this action; and

7. Granting such other and further relief as the Court may deem just and proper.

.

DATED:      New York, NY
            November _6_, 2015

                              **PAUL, WEISS, RIFKIND, WHARTON &**
                              **GARRISON LLP**

                              _Jenna C. Cohen_
                              Jenna Cohen

                              _Ekta_
                              Ekta Dharia

                              Audra Soloway
                              1285 Avenue of the Americas
                              New York, NY 10019
                              (212) 373-3000
                              _jccohen@paulweiss.com_
                              _edharia@paulweiss.com_
                              _asoloway@paulweiss.com_

                              **THE BRONX DEFENDERS**
                              Mariana Kovel
                              360 East 161st Street
                              Bronx, NY 10451
                              (718) 838-7878
                              _mollyk@bronxdefenders.org_

                              _Attorneys for Plaintiffs Ashraf Khodeir, Rasha_
                              _Elgahsh, A.K., M.K., AH.K., and AD.K._