UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ASHRAF KHODEIR, RASHA ELGAHSH,                    :
individually and on behalf of minor children
A.K., M.K., AH.K., and AD.K.                       :

                          Plaintiffs,             :        OPINION AND ORDER

                -v.-                               :
                                                          15 Civ. 8763 (GWG)
MARWAN SAYYED AND SUBHI SAYYED,                    :

                          Defendants.             :
-------------------------------------------------------------x

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

        Plaintiff Ashraf Khodeir and plaintiff Rasha Elgahsh, individually and on behalf of her

minor children, ("the Khodeirs") have sued defendants Marwan Sayyed ("Marwan") and Subhi

Sayyed ("Subhi"), alleging violations of the Fair Housing Act, 42 U.S.C. §§ 3601–19, and state

law claims arising from their tenancy in an apartment in the Bronx in 2014.  Defendants have

counterclaimed, alleging that plaintiffs breached their rental agreement by failing to make

monthly rental payments from April through November 15, 2014.  Plaintiffs and Marwan have

each moved for partial summary judgment.[1]  For the following reasons, we grant in part and

---

[1] Notice of Motion for Partial Summary Judgment, filed July 27, 2018 (Docket # 121)
("Pl. Not. Mot."); Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary
Judgment, filed July 27, 2018 (Docket # 122) ("Pl. Mem."); Declaration of Stephen C.
Thompson in Support of Plaintiffs' Motion for Partial Summary Judgment, filed July 27, 2018
(Docket # 123) ("Thompson Decl."); Local Rule 56.1 Statement of Undisputed Facts in Support
of Plaintiffs' Motion for Partial Summary Judgment, filed July 27, 2018 (Docket # 124); Notice
of Motion for Summary Judgment, filed July 27, 2018 (Docket # 125) ("Marwan Not. Mot.");
Memorandum of Law in Support of Motion of Defendant Marwan Sayyed for Summary
Judgment, filed July 27, 2018 (Docket # 126) ("Marwan Mem."); Affidavit of Marwan Sayyed
in Support of Motion for Summary Judgment, filed July 27, 2018 (Docket # 127) ("Marwan
Aff."); Statement of Material Facts Pursuant to Local Rule 56.1, filed July 27, 2018 (Docket
# 128) ("Marwan 56.1 Statement"); Plaintiffs' Memorandum of Law in Opposition to Defendant
Marwan Sayyed's Motion for Summary Judgment, filed Sept. 18, 2018 (Docket # 132) ("Pl.
Opp. Mem."); Declaration of Stephen C. Thompson in Support of Plaintiffs' Memorandum of

deny in part plaintiffs' motion for summary judgment, and deny Marwan's motion for summary judgment.

I. BACKGROUND

A. Facts

The following facts are undisputed unless otherwise stated.

On November 13, 2013, Subhi Sayyed and his wife deeded an apartment building located at 2150 Chatterton Avenue, Bronx, New York (the "Chatterton Building") to their son, Marwan Sayyed. See Quitclaim Deed (Individual or Corporation) (annexed as Exhibit 10 to Thompson Decl., as Exhibit A to Marwan Aff., and as Exhibit J. to Konopka Opp. Decl.); see also

_____

Law in Opposition to Defendant Marwan Sayyed's Motion for Summary Judgment, filed Sept. 18, 2018 (Docket # 133) ("Thompson Opp. Decl."); Plaintiffs' Response to M. Sayyed's Statement of Material Facts Pursuant to Local Rule 56.1, filed Sept. 18, 2018 (Docket # 134) ("Pl. Response to M. Subhi's 56.1"); Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed Sept. 18, 2018 (Docket # 135) ("Marwan Opp. Mem."); Declaration of Michael Konopka in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed Sept. 18, 2018 (Docket # 136) ("Konopka Opp. Decl."); Counter Statement of Defendant Marwan Sayyed in Opposition to Plaintiffs' Rule 56.1 Statement of Undisputed Facts, filed Sept. 18, 2018 (Docket # 137) ("Marwan Counter 56.1"); Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed Sept. 19, 2018 (Docket # 138) ("Subhi Opp. Mem."); Reply Memorandum of Law in Support of Motion of Defendant Marwan Sayyed for Summary Judgment, filed Oct. 12, 2018 (Docket # 140) ("Marwan Reply Mem."); Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment, filed Oct. 12, 2018 (Docket # 141) ("Pl. Marwan Reply Mem."); Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment, filed Oct. 12, 2018 (Docket # 142) ("Pl. Subhi Reply Mem."); Declaration of Stephen C. Thompson in Support of Plaintiffs' Memorandum of Law in Reply in Support of Their Motion for Partial Summary Judgment, filed Oct. 12, 2018 (Docket # 143) ("Thompson Reply Decl."); Declaration of Stephen C. Thompson in Further Support of Plaintiffs' Motion for Partial Summary Judgment, filed Oct. 25, 2018 (Docket # 146) ("Thompson Supp. Decl."); Letter from Michael Konopka, filed Nov. 8, 2018 (Docket # 147) ("Konopka Letter"); Letter from Stephen Thompson, filed Nov. 16, 2018 (Docket # 149) ("Thompson Letter"); Declaration of Stephen C. Thomspon in Further Support of Plaintiffs' Motion for Partial Summary Judgment, filed Nov. 16, 2018 (Docket # 150) ("Thompson Housing Court File Decl.").

Videotaped Deposition of Marwan Sayyed, dated Oct. 17, 2017 ("Marwan Dep."),[2] 51-53. The transfer was effected at least in part for the purposes of estate planning, as Subhi was getting older and his wife was beginning to suffer from dementia. See Marwan Aff., ¶¶ 8-9; Pl. Response to M. Subhi's 56.1, ¶ 22.

Several months later, in February 2014, plaintiffs Ashraf Khodeir and Rasha Elgahsh signed a month-to-month rental agreement to rent an apartment in the Chatterton Building. See Landlord and Tenant Agreement, dated Feb. 1, 2014 (annexed as Exhibit 11 to Thompson Decl. and as Exhibit L to Konopka Opp. Decl.) ("Rental Agreement"). The Agreement identified Subhi as the "landlord," and his signature appears on the agreement. Id. Marwan did not sign the agreement. Id. Plaintiffs resided in the apartment in the Chatterton Building with their four children and Elgahsh's mother between February 1, 2014, and late November 2014. See Deposition of the Plaintiff, Rasha Elgahsh, dated Nov. 7, 2017 ("Elgahsh Dep."),[3] 59-60; see also Marwan 56.1 Statement, ¶ 5.

Although Marwan was the owner of the Chatterton Building during the term of the Khodeirs' lease, the Khodeirs paid rent to Subhi. See Elgahsh Dep. at 80-93. As the record owner, Marwan was legally responsible for the payment of property taxes on the Chatterton Building, Marwan was aware of this fact, property tax bills arrived at his house in Connecticut beginning in November 2013, and he would either give them to Subhi to pay or would pay them

---

[2] Excerpts of Marwan Sayyed's deposition are contained in the record as Exhibit 2 to the Thompson Decl.; Exhibit D to the Marwan Aff.; ECF page *76-81 of the Marwan 56.1 Statement; Exhibit A to the Thompson Opp. Decl.; Exhibit C to the Konopka Opp. Decl.; and at ECF pages *10-12 of the Marwan Counter 56.1.

[3] Excerpts of Elgahsh's deposition are contained in the record as Exhibit 4 to the Thompson Decl. and as an attachment to the Marwan's 56.1, at ECF pages *24-37.

himself if the money from the rentals was insufficient to cover them.  See Marwan Dep. at 42-44, 138-42.

On October 16, 2014, a criminal complaint was filed against Ashraf Khodheir ("Khodeir") for assaulting Subhi.  See New York City Policy Department Complaint # 2014-043-11912 (annexed as Exhibit G to Affidavit in Support of Motion to Dismiss) (Docket # 24) ("Criminal Complaint").  On October 19, 2014, Subhi obtained a temporary Order of Protection against Khodheir, which ordered Khodheir to stay away from Subhi as well as from Subhi's home and place of employment.  See Temporary Order of Protection, dated Oct. 19, 2014 (annexed as Exhibit N to Konopka Opp. Decl.) ("Order of Protection").  After the issuance of the Order of Protection, Khodheir stopped residing in the Chatterton Building and began staying at his workplace in Queens.  See Elgahsh Dep. at 144; Deposition of Ashraf Khodeir, dated Nov. 8, 2017 ("A. Khodheir Dep."),[4] at 103-04.

As of November 12, 2014, plaintiffs had failed to pay their electric bill to Consolidated Edison Company of New York ("Con Ed") and the electricity in the apartment was turned off. See Elgahsh Dep. at 141 (noting that Con Ed turned the Khodeirs' electricity off the same day she made a payment to Con Ed with her Citibank card); Rasha M. Elgahsh Citi Card Statement, billing period ending Nov. 24, 2014 (annexed as Exhibit 12 to Thompson Decl.) ("Elgahsh Credit Card Statement"), *4 (indicating payment of $243.35 to Con Ed on November 12, 2014); see also Excerpts of Videotaped Deposition of Jannan Sayyed, dated Dec. 17, 2017) ("Jannan

---

[4]  Excerpts of Ashraf Khodeir's deposition appear at Exhibit 5 to the Thompson Decl.; as Exhibit F to the Konopka Opp. Decl.; Exhibit G to the Thompson Reply Decl.; and ECF pages *16, *54-56 to Marwan Counter 56.1.

Dep."),[5] 65-66.  Con Ed had contacted Subhi to request access to the Chatterton Building to turn

off the Khodeir family's electricity and he had given them such access.  Janan Dep. at 65-66; see

also Marwan Opp. 56.1 Statement, ¶ 5 (admitting that Con Ed contacted Subhi on or before

November 12, 2014, to request access to the Chatterton Building to turn off the Khodeir family's

electricity).[6]  According to both Elgahsh and Con Ed records, Elgahsh made a $240 payment on

the family's arrears to Con Ed on November 12, 2014, see Elgahsh Dep. at 141; Elgahsh Credit

Card Statement, at *4; Records of Consolidated Edison of New York, Inc., (annexed as Exhibit

14 to Thompson Decl.) ("Con Ed Records Ex. 14"), *12, which was sufficient to allow their

electricity to b e turned back on, see Examination Before Trial of Calvin Merritt, on Behalf of

Consolidated Edison Company of New York, Inc., dated March 16, 2018 ("Merritt Dep."),[7] 93.

Con Ed records indicate that the company spoke with the landlord of the Chatterton Building to

obtain access to the building on November 12, 2014, in order to turn the Khodheirs' electricity

back on.  See Records of Consolidated Edison of New York, Inc. (annexed as Exhibit 15 to

Thompson Decl.) ("Con Ed Records Ex. 15"), at *6.[8]  These records show that a person

---

[5] Excerpts of Janan Sayyed's deposition appear as Exhibit 3 to Thompson Decl.; Exhibit D to the Konopka Opp. Decl; and Exhibit B to the Thompson Reply Decl.

[6] During his deposition, Subhi testified that while Con Ed did routinely contact him for access to the basement of the Chatterton Building to turn a tenant's electricity on or off, he could not recall whether Con Ed had contacted him with respect to the Khodeirs. Videotaped Deposition of Subhi Sayyed, dated Nov. 16, 2017 (excerpts of Subhi's deposition testimony are contained in Exhibit 1 to the Thompson Decl.; Exhibit B to the Thompson Opp. Decl.; Exhibit B to the Konopka Opp. Decl; Exhibit H to Thompson Reply Decl.; and at ECF pages *29-30, and *62-63 to Marwan's 56.1 Counterstatement) ("Subhi Dep."), 148-49.

[7] Excerpts of Calvin Merritt's deposition appear as Exhibit 9 to Thompson Decl. and Exhibit O to the Konopka Opp. Decl.

[8] Subhi argues that "any allegation that Subhi refused to provide Con Edison with access to the basement is inadmissible hearsay . . . ."  Subhi Opp. Mem. at 6.  For the reasons stated in

5

identified as the landlord ("L/L") stated to Con Ed that he would not provide access to the building, that nobody should be living in the apartment, and that he would sue Con Ed if they tried to provide service.  Id.  The electricity was not restored to the Khodheirs' apartment as of the time they left the apartment later that month to stay at a hotel.  See Elgahsh Dep. at 144; see also A. Khodeir Dep. at 119-20; Examination Before Trial of A.K., dated Oct. 13, 2017 ("A.K. Dep."),[9] 129.

In the meantime, on October 27, 2014, Subhi obtained a default judgment in Housing Court against Khodeir, Elgahsh, and a Jane Doe defendant, awarding him a judgment of possession.  See Civil Court of the City of New York, County of Bronx Decision and Judgment, Index # 045373/2014 (annexed as Exhibit W to Konopka Opp. Mem.) ("Default Judgment").  A notice of eviction was served upon the Khodeirs on November 19, 2014.  See Affidavit of Service Notice of Eviction, dated Nov. 19, 2014 (annexed as part of Exhibit A to Thompson Reply Decl.) ("Notice of Eviction"), *3.  The notice was dated November 20, 2014, and provided that plaintiffs could be evicted on the sixth business day after the date of the notice, see id. at *4, which would have been December 1, 2014, because the Thanksgiving holiday fell during the intervening days.  However, on November 24, 2014, Housing Part K of the Bronx Civil Court issued an Order to Show Cause which stayed the eviction proceedings against the Khodheirs.  See Order to Show Cause, dated Nov. 24, 2014 (annexed as Exhibit A to Thompson Supp. Decl.) ("OSC").  On November 24, 2014, Graham F. Dumas, Esq., of the Bronx Defenders, who represented plaintiffs in the eviction proceeding, filed two Affirmations of

_____

section II.A, below, we reject this argument.

[9] Excerpts of A.K.'s deposition appear in Exhibit 6 to Thompson Decl. and Exhibit G o the Konopka Opp. Decl.

Service attesting that he served the Order to Show Cause on Subhi's attorney by mail, see Affirmation of Service, dated Nov. 24, 2014 (annexed as part of Exhibit A to Thompson Housing Court File Decl.), *2, and on the City Marshal, see Affirmation of Service, dated Nov. 24, 2014 (annexed as part of Exhibit A to Thompson Housing Court File Decl.), *3.

At some point in late November 2014, around Thanksgiving, which that year fell on November 27, Elgahsh and her children left their apartment in the Chatterton Building with at least some of their belongings. See Elgahsh Dep. at 144; Excerpts of Videotaped Deposition of Maxine Clarke, dated Dec. 9, 2017 ("Clarke Dep."),[10] 40-42; Excerpts of Video-Recorded Non-Party Deposition of Khaled Elhusseiny, dated Jan. 27, 2018 ("Elhusseiny Dep."),[11] 60-64; see also A. Khodeir Dep. at 119-20; A.K. Dep. at 134. The Khodheirs had signed a lease for a new apartment that started on December 1, 2014. See Lease Agreement, filed Oct. 12, 2018 (annexed as Exhibit F to Thompson Reply Decl. and as Exhibit S to Konopka Opp. Decl.). After leaving the Chatterton Building, Elgahsh and her children stayed in a hotel for several days. See Elgahsh Dep. at 144; Elgahsh Credit Card Statement, at 3 (showing charge for $383.77 for a hotel on November 25, 2014); A. Khodeir Dep. at 119-20, A.K. Dep. at 134.

On November 28, 2014, Elgahsh returned to the Chatterton Building, see Response to Plaintiffs' Rule 56.1 Statement (annexed to Konopka Opp. Decl.) (Docket # 136-1), ¶ 9, and was unable to use her key to enter her apartment. See A.K. Dep. at 301; Excerpts of Videotaped

---

[10] Excerpts of Maxine Clarke's deposition are annexed as Exhibit U to the Konopka Opp. Decl.; as Exhibit I to the Thompson Reply Decl; and as ECF pages *32-44, *58-61 to Marwan's 56.1 Counterstatement.

[11] Excerpts of Khaled Elhusseiny's deposition appear as Exhibit 7 to the Thompson Decl.; Exhibit H to the Konopka Opp. Decl.; Exhibit E to the Thompson Reply Decl.; and as ECF pages *45-51 of Marwan's 56.1 Counterstatement.

Deposition of Fernando Gonzalez, dated Oct. 25, 2017 (annexed as Exhibit 8 to Thompson Decl.) ("Gonzalez Dep."), 13-16. Elgahsh called the police. See Gonzalez Dep. at 10-13. The police contacted the City Marshal and confirmed that Elgahsh was not currently subject to an order of eviction. New York City Police Department - Omniform System Complaint, dated Nov. 28, 2014 (annexed as Exhibit 13 to Thompson Decl.) ("November 28, 2014, NYPD Complaint Report"), *2. Officer Fernando Gonzalez, one of the officers who responded to the call, testified that after attempting to enter into Elgahsh's apartment, he and his partner called a locksmith, and that the apartment was empty when it was opened. Gonzalez Dep. at 13-17; see also November 28, 2014 NYPD Complaint Report, at *2 (stating that signatory, Sgt. Kenny, called a locksmith after attempting to contact landlord at 2110 Watson Ave. residence with "neg results"). He testified that Elgahsh was very upset upon seeing the empty apartment and told him that "all her stuff was gone." Gonzalez Dep. at 17; see also November 28, 2014 NYPD Complaint Report, at *2. Gonzalez further testified that he walked alongside the Chatterton Building with Elgahsh and observed furniture, clothing, suitcases, and mattresses, some of which were damaged, including cut-up mattresses and broken dressers. Gonzalez Dep. at 19-20; November 28, 2014 NYPD Complaint Report, at *2. Elgahsh identified these items as her belongings. Gonzalez Dep. at 19. Gonzalez testified that he did not see any electronics, which Elgahsh said were missing. Id.

B. Procedural History

On November 6, 2015, plaintiffs filed a complaint against defendants alleging violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq., and various state law causes of action. See Complaint and Jury Demand, filed Nov. 6, 2015 (Docket # 1) ("Compl."). Plaintiffs alleged that the defendants discriminated against them on the basis of family status, harassed them,

unlawfully evicted them, and destroyed their property.  See Compl. ¶ 1.  After Subhi moved to dismiss the original Complaint, see Notice of Motion, filed Jan. 15, 2016 (Docket # 14), plaintiffs filed an Amended Complaint, see Amended Complaint and Jury Demand, filed Feb. 5, 2016 (Docket # 20) ("Am. Compl.").  Defendants moved to dismiss the Amended Complaint, as well as to strike certain statements from the Amended Complaint.  See Notice of Motion, filed Feb. 26, 2016 (Docket # 21); Notice of Motion, filed Feb. 26, 2016 (Docket # 26).  These motions were denied on September 28, 2016.  See Memorandum & Order, filed Sept. 28, 2016 (Docket # 44).

On June 2, 2017, Subhi filed an Amended Answer to the Complaint that included counterclaims for breaches of contract, fraud, and assault.  See Defendant Subhi Sayyed's Amended Answer to Amended Complaint and Counterclaims, filed June 2, 2017 (Docket # 57). In an order dated November 1, 2017, this Court dismissed three of Subhi's counterclaims but sustained his counterclaim for breach of contract for nonpayment of rent.  See Khodeir v. Subhi, 323 F.R.D. 193 (S.D.N.Y. 2017).  On July 27, 2018, plaintiffs and Marwan filed the instant motions for summary judgment.

C. Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex, 447 U.S. at 323).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[O]nly admissible evidence need

be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

II. DISCUSSION

A. Unlawful Eviction

Plaintiffs seek partial summary judgment on the question of whether Subhi unlawfully

10

evicted them from their apartment in the Chatterton Building. Pl. Mem. at 5-6. They offer two routes to such a ruling. First, plaintiffs argue that Subhi constructively evicted them from their apartment by refusing Con Ed access on November 12, 2014, to restore their electricity. See id. Additionally, they argue that Subhi actually evicted them (or, as plaintiffs sometimes put it, "illegally evicted" them) by changing the locks on their apartment door on November 28, 2014, depriving them of physical possession of the apartment. Id. at 7-8. Because we find that plaintiffs have shown they are entitled to a summary judgment ruling that they were constructively evicted by Subhi's actions on November 12, 2014, it is not necessary to reach the issue of whether they were actually evicted on November 28, 2014.

Under New York law, "constructive eviction exists where, although there has been no physical expulsion or exclusion of the tenant, the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises." Barash v. Pennsylvania Terminal Real Estate Corp., 26 N.Y.2d 77, 83 (1970) (citations omitted); accord Leeber Realty LLC v. Trustco Bank, 316 F. Supp. 3d 594, 610 (S.D.N.Y. 2018); Eastside Exhibition Corp. v. 210 E. 86th St. Corp., 18 N.Y.3d 617, 627 (2012). "To be an eviction, constructive or actual, there must be a wrongful act by the landlord which deprives the tenant of the beneficial enjoyment or actual possession of the demised premises." Barash, 26 N.Y.2d at 82. As the Court of Appeals has held in 1890:

> The heating of the apartments, the supply of water, all sanitary arrangements and many other things essential to the proper enjoyment of the apartments in the building by the tenants thereof, are regulated and controlled by the landlord, and he owes a duty to the tenant to see that all such matters and appliances are kept in proper order, and if he persistently neglects them, and by reason of such neglect, the tenant is deprived of heat or water, or his apartments are filled with gas or foul odors from the same, and the apartments become unfit for occupancy, the tenant is deprived of the beneficial enjoyment thereof, and the consideration for which he agrees to pay rent fails and there is a constructive eviction.

Tallman v. Murphy, 120 N.Y. 345, 352 (1890); accord McBean v. Peaster, 25 Misc. 2d 400, 401, (N.Y. Mun. Ct. 1960).  Since that time, it has been held that depriving a tenant of electricity can constitute constructive eviction.  See Drapaniotis v. 36-08 33rd St. Corp., 48 A.D.3d 736, 737 (2d Dep't 2008)  ("the locking of the electric box by [the lessor] constituted a constructive eviction, since it substantially and materially deprived the [tenant] of the beneficial use and enjoyment of the premises").[12]

At the outset, we reject Subhi's argument that we should not consider the Khodeirs' claim for constructive eviction because "no such relief, or anything approaching such relief, can be found in the Amended Complaint."  Subhi Opp. Mem. at 1.  In their Amended Complaint, the Khodeirs allege that defendants engaged in unlawful entry and "evict[ion]" in violation of N.Y.C. Admin Code § 26-521(a)(1), (2), and/or (3).  Am. Compl. ¶ 126.  Paragraph 2 of § 26-521(a) prohibits "engaging in a course of conduct which interferes with or is intended to interfere with or disturb the comfort, repose, peace or quiet of such occupant in the use or occupancy of the dwelling unit, to induce the occupant to vacate the dwelling unit including, but not limited to, the interruption or discontinuance of essential services."  Id.  This section thus prohibits conduct that amounts to constructive eviction.  The Amended Complaint describes in detail the plaintiffs' version of the events, and alleges that "[d]ue to the lack of electrical power and because Subhi Sayyed refused to grant Con Ed technicians access to restore electricity, the premises were unfit for human habitation," thus forcing the Khodeirs "to temporarily relocate to

---

[12]  Additionally, for their to be a constructive eviction, the tenant must abandon possession following the acts constituting the constructive eviction with "reasonable promptness."  Leider v. 80 William St. Co., 22 A.D.2d 952, 953 (2d Dep't 1964).  Defendants do not argue that the "reasonable promptness" requirement has not been met.  Accordingly, we do not discuss it further.

a hotel for several days." Am. Compl. ¶ 77. While Subhi is correct that the Khodheirs do not include a cause of action explicitly labeled "constructive eviction" in the amended complaint, "under the liberal rules of federal pleading, the label of a claim is not dispositive." BLT Rest. Group LLC v. Tourondel, 855 F. Supp. 2d 4, 19 n. 9 (S.D.N.Y. 2012); In re Motel 6 Securities Litig., 93 CIV. 2183 JFK, 2000 WL 322782, at *7 (S.D.N.Y. Mar. 28, 2000). The defendants were plainly on notice that plaintiffs were making such a claim given that the Amended Complaint contains facts sufficient to state a cause of action for constructive eviction. See Am. Compl. ¶¶ 70-79.

Here, viewing the facts in the light most favorable to Subhi, the undisputed facts establish that the Khodeirs were constructively evicted from their apartment by Subhi's refusal to allow Con Ed to turn on their electricity. The Rental Agreement specifically instructed the Khodeirs to "[g]o to Con Edison to turn on light and gas." Rental Agreement. It is undisputed that Con Ed required Subhi's permission and assistance to access the portion of the basement where the electric breakers were located. See Elgahsh Dep. at 141-42; Elhusseiny Dep. at 57; Subhi Dep. at 148-49. Con Ed records and deposition testimony from a Con Ed representative establish that on November 12, 2014, the Khodheirs paid an amount towards their arrears sufficient to have their electricity turned back on. See Con Ed Records Ex. 14, at *11; Merritt Dep. at 93; see also Elgahsh Credit Card Statement, at *4 (indicating payment of $243.35 to Con Ed on November 12, 2014).

A Con Ed record shows that a Con Ed representative spoke with the landlord of the Chatterton Building to obtain access to the building to turn back on the Khodheirs' electricity on November 12, 2014. See Con Ed Records Ex. 15, at *6. These records reflect that the "L/L" (that is, the landlord) stated to Con Ed that he would not provide access to the building, that

13

nobody should be living in the apartment, and that he would sue Con Ed if they tried to provide service. Id.[13]

The deposition testimony of Khaled Elhusseiny and Rasha Elgahsh also supports the constructive eviction claim. At the time of the alleged constructive eviction, Khaled Elhusseiny lived in the basement of the Chatterton Building and paid reduced rent in exchange for helping Subhi with the maintenance of the building. See Janan Dep. at 68. Elhusseiny testified that when Con Ed ultimately came to turn the Khodheirs' electricity back on, Elgahsh came and woke him up and asked him whether he had a key to open the door to the room that contained the electric breakers. See Elhusseiny Dep. at 56. Elhusseiny testified that he told Elgahsh that he did not have a key and then called Subhi. Id. at 56-57. Elhusseiny stated that Subhi told him that he was in Connecticut and would be back Monday. Id. at 57. Elhusseiny testified that he did not know for certain whether Con Ed ever turned the Khodeirs' electricity back on. See id. at 58. Rather, when Subhi returned from Connecticut, he told Elhusseiny that "the electricity company they didn't come" and that the Khodeirs "didn't pay the bill for the electricity." Id.

The argument section of Subhi's brief is devoid of any explanation as to why Subhi's refusal to provide Con Edison with access to the basement would not constitute a constructive eviction. Subhi refers to the statements in Con Ed record as "inadmissible hearsay," Subhi Opp.

---

[13] Subhi does not argue that the landlord referred to in the record is someone other than himself. Nor could he, given that all of the evidence in the record demonstrates that Subhi identified himself as the landlord of the Chatterton Building in 2014, see, e.g., Rental Agreement (identifying Subhi as the landlord); Marwan Aff. ¶¶ 10, 13 (noting that after the conveyance of the Chatterton Building, Subhi "executed rental agreements as landlord" and "[d]uring 2013, 2014 and 2015 . . . exercised sole and exclusive dominion and control over . . . Chatterton"), and that he had done so specifically to Con Ed, see Janan Dep. at 65-66 (stating that Con Ed addressed a letter regarding turning the Khodheirs' electricity off to Subhi and that he let Con Ed into the building to turn the electricity off); Subhi Dep. at 148-49 (noting that Con Ed had contacted him on previous occasions to access the building to turn electricity on or off).

Mem. at 6, but he gives no explanation as to why this is so. Subhi does not deny that the document itself is admissible as a business record. See Fed. R. Evid. 803(6); see also Con Ed Records Ex. 15, at *2 (certifying that the records provided "are true copies of records maintained by Consolidated Edison Company of New York, Inc., in the normal course of business"). Nor does he argue that the statements of the landlord recounted in the Con Ed document would not be admissible against him as the statement of a party-opponent. See Fed. R. Evid. 801(d)(2). Instead, Subhi's brief points only to Elhusseiny's deposition testimony in which Elhusseiny testified that Subhi was in Connecticut at the time Con Ed came. Subhi Opp. Mem. at 6 (citing Elhusseiny Dep. At 59).[14] But given the ubiquity of cellphones, the fact that Subhi was in Connecticut does nothing to suggest that he did not have a telephone conversation with Con Edison about its entry into the building.

While Subhi has not made the argument, and it is certainly not the Court's job to find evidence to support Subhi's arguments, see CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 125 (2d Cir. 2013) ("District Court is not required to scour the record on its own in a search for evidence when the [nonmovants] fail to present it") (citation and internal quotation marks omitted), we note that the excerpts of Subhi's deposition provided to the Court do not appear to show that Subhi ever denied that the conversation with Con Ed took place as described in the Con Ed record. Instead, there is testimony in which Subhi states that he "do[es] not] remember" whether "anyone from Con Edison ask[ed] for access to the basement in connection with the Khodeir family," that he does not recall Elgahsh ever asking him to allow

---

[14] Subhi's brief refers Elhusseiny's testimony that Subhi had said he would not oppose any action by the "government." Subhi Op. At 6. But because Subhi's statement is being offered by Subhi himself, it is not admissible as a statement of a party opponent under Fed. R. Evid. 802, and Subhi offers no other explanation for its admissibility.

Con Ed to enter the basement.  Subhi Dep. at 149.  He never denies that the conversation

happened, however.  Had Subhi raised the issue, we would have found that Subhi's mere "failure

to recall" does not raise a triable fact regarding whether the conversation actually occurred.  See

Cheeseboro v. Little Richie Bus Serv., Inc., 254 F. Supp. 3d 485, 492 (E.D.N.Y. 2017) (where

there is "clear" testimony,"Plaintiff's failure to remember cannot create an issue of fact sufficient

to withstand summary judgment"), aff'd, 722 F. App'x. 107 (2d Cir. 2018) (summary order).

Accordingly, based on the evidence in the record, a reasonable jury would have to

conclude that Subhi prevented Con Ed from accessing the electric breakers in the basement.  The

evidence also shows that the Khodeirs obtained a stay in their eviction proceedings, which gave

them the legal right to stay in their apartment at least through the order's return date of

December 12, 2014.  See OSC, at *2; see also November 28, 2014, NYPD Complaint Report

(noting that police called the City Marshal on November 28, 2014, and confirmed that Elgahsh

had not yet been evicted).  Subhi offers no argument that these facts, if established, do not show

a constructive eviction.  Thus, plaintiffs are entitled to summary judgment on this issue.

B. Vicarious Liability Against Marwan

We next consider whether Marwan, as owner of the Chatterton Building in November

2014, is vicariously liable for any torts or Fair Housing Act violations committed by Subhi with

respect to plaintiffs' tenancy.  Plaintiffs and Marwan have both moved for summary judgment on

this issue.  Plaintiffs argue that Marwan is liable either because Subhi was his employee or

because Subhi was his agent.  See Pl. Mem. at 10.  Because we find that plaintiffs are entitled to

summary judgment that Subhi was Marwan's agent, it is not necessary to reach the question of

whether Subhi was Marwan's employee.

Under New York common law, "[a] principal-agent relationship is established by

evidence that one person — the principal — has allowed another to act on his or her behalf, subject to his or her control, and evidence of consent by the other person — the agent — to so act." Zeus Constr. Servs., LLC v. Fame Constr., Inc., 60 Misc. 3d 13, 19 (N.Y. App. Term. 2018); accord Cleveland v. Caplaw Enterprises, 448 F.3d 518, 522 (2d Cir. 2006); Maurillo v. Park Slope U-Haul, 194 A.D.2d 142, 146 (2d Dep't 1993). "An agent's authority may be express, implied, or apparent." Zeus, 60 Misc. 3d at 19 (citations omitted); accord C.E. Towers Co. v. Trinidad & Tobago (BWIA Int'l) Airways Corp., 903 F. Supp. 515, 523 (S.D.N.Y. 1995).

"Actual authority is the result of the principal's consent manifested to the agent." C.E. Towers Co., 903 F. Supp. at 523 (internal punctuation and citation omitted). "An agent may be expressly given power to act on behalf of a principal or the authority may be implied." Id.; accord Greene v. Hellman, 51 N.Y.2d 197, 204 (1980). "An agent enjoys implied authority to enter into a transaction when the principal by its acts reasonably gives the appearance of authority to the agent." C.E. Towers Co., 903 F. Supp. at 523; accord Greene, 51 N.Y.2d at 204.

By contrast,

apparent authority is entirely distinct from authority, either express or implied, and arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him.

Minskoff v. Am. Exp. Travel Related Services Co., Inc., 98 F.3d 703, 708 (2d Cir. 1996) (internal punctuation and citations omitted); accord Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc., 241 F. Supp. 2d 246, 261 (S.D.N.Y. 2002). While "apparent authority does not turn on the representations made by a principal to his agent, but rather on whether the representations made by the principal to a third party created the appearance of authority[,] [t]hese representations . . . need not be made through actual contact between the principal and third

party."  Id. (emphasis in original).

The Supreme Court has held that, under the Fair Housing Act ("FHA"), a principal may be vicariously liable for the acts of an agent because "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."  Meyer v. Holley, 537 U.S. 280, 285 (2003).  Both the Supreme Court and the Second Circuit have looked to common-law principles as expressed in the Restatement (Second) of Agency.  See id. at 286 (citing the Restatement (Second) in discussion of vicarious liability in FHA claims); Cleveland, 448 F.3d at 522 (citing Restatement (Second) in discussion of agency law in FHA context).  The New York Court of Appeals, too, cites to the Restatement (Second) of Agency for purposes of articulating principles of agency.  See, e.g., Doe v. Guthrie Clinic, Ltd., 22 N.Y.3d 480, 487 (2014); Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979).

The Second Circuit's description of a principal's liability under the Fair Housing Act mirrors New York law.  Thus, citing (among other authorities) the Restatement (Second) of Agency, the Second Circuit has held that the existence of an agency relationship requires proof of three elements: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking."  Cleveland, 448 F.3d at 522 (internal punctuation and citations omitted).

Here, considering all evidence in the light most favorable to Marwan, the uncontested evidence establishes that during the relevant time period, Marwan implicitly granted Subhi actual authority to conduct all aspects of management of the Chatterton Building.

In 2014, Marwan was the owner of the Chatterton Building.  See Quitclaim Deed.  The

18

owner of property enjoys certain rights, such as the right of possession, see Wood v. Fisk, 156

A.D. 497, 501 (1st Dep't 1913), aff'd, 215 N.Y. 233 (1915), and the right to collect rents,

see New York Life Ins. Co. v. Fulton Dev. Corp., 265 N.Y. 348, 351(1934); accord In re Sterling

Bank & Tr. Co. of N.Y., 21 N.Y.S.2d 566, 569 (Sup. Ct. Queens Cty. Special Term 1940).  An

owner also has certain duties, such as the non-delegable duty to maintain dwellings that are

leased to others, see, e.g., N.Y. Mult. Dwell. Law § 78, and the duty to pay property taxes,

N.Y. Real Prop. Tax Law § 502(2).

Marwan gives no testimony that he delegated someone other than Subhi the authority to

engage in any of these activities.  It is undisputed, however, that Subhi collected rents, signed the

lease as a "landlord," and otherwise "t[ook] care of the property."  See, e.g., Marwan Dep. at 68,

123-26; Elgahsh Dep. at 80-93 (recounting how Elgahsh paid rent to Subhi); Marwan Aff. ¶¶ 9-

14 ("Following the title transfer . . . Subhi continued to manage Chatterton just as he had before

the title conveyance."); Rental Agreement (identifying Subhi as the landlord).  This provides

powerful circumstantial evidence that Subhi was not proceeding as a rogue actor but was instead

acting as an agent of the only person who could otherwise permissibly engage in these activities:

Marwan, the actual owner of the building.

In his deposition testimony and his briefing, Marwan repeatedly asserts that there was no

"agreement" between him and his father regarding the Chatterton Building.  See Marwan Dep. at

43 ("We didn't have an agreement.  Just if the bills came in, he would pay them."); id. at 123-24

("It wasn't an agreement.  It was just he knew he would take care of the property.  It was just a

title transfer.").  But the law of agency does not require an explicit agreement; rather the

agreement may be merely "informal, implicit, and nonspecific."   Restatement (Third) of Agency

§ 1.01 cmt. d (2006).  Also, the principal's manifestation of assent to an agency relationship

19

need not be "through written or spoken words" but instead may be by means of "other conduct." Id. § 1.03.

    This is not a case where Marwan was unaware that he was the owner of the building, let alone unaware of his responsibilities as the owner. For example, Marwan acknowledged that he received property tax bills for the Chatterton Building in 2013 and 2014, and occasionally paid them when his father was short. Marwan Dep. at 137-42.[15] Marwan acknowledged that, if his father were to not pay the property taxes on the Chatterton Building, Marwan would have to pay them because they were his "liability" as the owner of the building. See id. at 43. Marwan also acknowledged that he knew that his father was paying property taxes on the Chatterton Building, id. at 42-43, although he denied that his father was paying the taxes at his direction, id. at 43. While Marwan stated that his father would not inform him about property tax payments, Marwan testified that he "just [knew] automatically" that his father had paid the taxes because "[t]hat's the type of man he is." Id. at 44. Later in his deposition, Marwan acknowledged that he and his father did speak about tax bills that arrived at Marwan's home in Connecticut. Id. at 140. Marwan also acknowledged that on November 13, 2013, during the title transfer of the Chatterton Building, he signed a document stating that as the owner of the Chatterton Building, he was legally responsible for water and sewage charges for the building, id. at 67-68, even though his father paid those water and sewage bills, id. at 68. Marwan acknowledged that, also on November 13, 2013, he signed a document attesting that there was an operational smoke

---

    [15] Early in his deposition testimony, Marwan denies receiving property tax bills for the Chatterton building in either 2013 or 2014. Marwan Dep. at 42. However, later in his deposition testimony, upon examining a Property Tax Bill Quarterly Statement from 2014 sent to his address in Connecticut, id. at 139, Marwan acknowledged that the tax bills began being sent to him after the Chatterton Building was deeded to him, see id. 140-41.

detector at the Chatterton Building, see id. at 122, and that he knew this because his family had always provided working smoke detectors in the building, and because he confirmed with his father prior to signing the document, id. at 122-23.

While Marwan refused to acknowledge the existence of any "agreement," he testified that when his father transferred title to the Chatterton Building to him on November 13, 2013, Marwan knew that his father "would still take care of the property," id. at 123,  that his father "would rent the apartments and collect the rents, id. at 124, that his father would advertise the apartments, id., and that his father would sign and enter into month-to-month agreements with tenants, id. at 125.

The only reasonable inference to be drawn from this evidence is that Marwan assented to an arrangement under which Subhi would continue to manage the building as he always had and would keep the rent as income for himself.  Even if a jury found that Marwan was entirely silent, and merely accepted the arrangement proposed by his father, the fact that Marwan permitted his father to do all the acts that could only be done with the authority of the owner of property–and that Marwan did not protest his father's doing so–would be enough to show that he assented to his father's acting as his agent.  As is stated in the Restatement (Third) Of Agency § 1.03, "[s]ilence may constitute a manifestation [of assent to agency] when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence.  Failure then to express dissent will be taken as a manifestation of affirmance."  Id. cmt. b (emphasis added).  Applying this concept to this situation here, if an individual was collecting rents and bringing eviction proceedings without the authority of the landlord, any reasonable landlord would not remain "silen[t]" but rather would "express dissent."  Marwan's failure to do so demonstrates a "manifestation of affirmance" of the agency

relationship.

Marwan notes that in <u>Cleveland v. Caplaw Enterprises</u>, 448 F.3d 518 (2d Cir. 2006), the Second Circuit's conclusion that plaintiffs had shown an agency relationship referenced the fact that there was a property management agreement. Marwan Mem. at 11. Marwan argues that because there was no such agreement in this case, the agency relationship is lacking. <u>Id.</u> at 11-12. In <u>Cleveland</u>, however, the Second Circuit never held that the existence of such an agreement was necessary to find the existence of an agency relationship.

Marwan's citation of <u>Glover v. Jones</u>, 522 F. Supp. 2d 496 (W.D.N.Y. 2007), <u>see</u> Marwan Mem. at 12, is unavailing for similar reasons. While <u>Glover</u> found that an agency relationship in that case was "established by judicial admission," as Marwan notes, Marwan Mem. at 12, <u>Glover</u> does not suggest that a judicial admission is necessary to establish an agency relationship.

<u>United States v. Hylton</u>, 944 F. Supp. 2d 176 (D. Conn. 2013), cited by Marwan, Marwan Mem. at 12, is particularly unhelpful to his case. In <u>Hylton</u>, a married couple owned multiple properties in Connecticut and the husband was the sole owner, officer, and director of a management company that managed all of the properties. 944 F. Supp. 2d at 182. The wife was the sole owner of the property in question in the case, but the court found that "[s]he had no involvement in renting the house or in interacting with the renters . . . ." <u>Id.</u> Rather, the court found that "[s]he had [her husband] handle all aspects of the rental." <u>Id.</u> The court noted that the husband "discussed with her all of the actions he was taking," <u>id.</u> at 191, such that "Mr. Hylton did not act alone in renting the property," <u>id.</u> at 182. <u>Hylton</u> concluded that Mr. Hylton was Mrs. Hytlon's agent as follows:

Mrs. Hylton owns 5 Townline Road. Yet, she had no involvement in renting the house or

in interacting with the renters . . . .  She had Mr. Hylton handle all aspects of the rental. Therefore, the first two elements of agency are satisfied: Mrs. Hylton gave Mr. Hylton authority to act on her behalf and Mr. Hylton accepted such authority.

944 F. Supp. 2d at 190–91.  By the "first two elements of agency," the court was referring to  the required showing of "(1) the manifestation by the principal that the agent shall act for him; [and] (2) the agent's acceptance of the undertaking."  Cleveland, 448 F.3d at 522.  In other words, Hylton found that an agreement as to agency was reached based on the fact that Mrs. Hylton owned the building while Mr. Hylton managed it.  See Hylton, 944 F. Supp. 2d at 190-91.

The only issue that remained to be discussed in Hylton was whether there was an "understanding of the parties that the principal is to be in control of the undertaking"–the third element of agency.  The Hylton court noted that Mr. Hylton discussed his actions with Mrs. Hylton and that Mrs. Hylton signed the leases in question.  844 F. Supp. 2d at 191.  Hylton found that Mrs. Hylton's signature, following her discussion of the rentals with her husband, "indicat[ed] her approval and agreement."  Id.  Once again, the fact that Hylton found the wife's action to meet an element of the required showing of agency does not represent a finding that it was necessary.  In fact, the Restatement of Agency, upon which the Cleveland test is based, is clear that what matters is that a princpal has the "right to control" the agent, see Restatement (Third) Of Agency § 1.01 cmt. c, f, not that the principal actually exercised that control, see id. cmt. c ("A principal's failure to exercise the right of control does not eliminate it, nor is it eliminated by physical distance between the agent and principal.").  The fact that Marwan claims he gave no direction to Subhi is thus immaterial.  See id. cmt. f ("To the extent the parties have created a relationship of agency . . . the principal has a power of control even if the principal has previously agreed with the agent that the principal will not give interim instructions to the agent or will not otherwise interfere in the agent's exercise of discretion.").  Thus, it is well-established

that "[i]t is not essential that [the principal make] use of [the right to control]," or even that a principal's "efforts to control [be] effective." In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2014 WL 4966072, at *30 (E.D.N.Y. Oct. 3, 2014). Here, by virtue of his ownership of the Chatterton Building, Marwan had the legal right to control its management, even if he made little or no use of that right.

Recognizing that Cato v. Jilek, 779 F. Supp. 937 (N.D. Ill. 1991), broadly held that "both spouses are liable when one spouse engages in discriminatory conduct while renting jointly owned property, " id. at 946 n.21, Marwan argues that Cato's ruling is implicitly premised on the fact that married co-owners of a property jointly benefit from the enterprise renting that property and that Marwan did not benefit. Marwan Mem. at 12-13. In fact, Cato contains no discussion of this circumstance.

Marwan also notes that in Cato the vicariously liable wife "deferred" to her husband's decisions regarding the question of apartment rentals. Id. at 13. Marwan argues that "[i]n order to have deferred to George [the husband], Beverly [the wife], by definition, must have had [sic] abdicated her right to input in the decision making process." Id. Marwan argues that by contrast, in this case, "there is no evidence that Marwan deferred to Subhi" because "Marwan had no right to make decisions, and thus could not have abstained from asserting such right." Id. Contrary to Marwan's argument, though, as the sole owner of the Chatterton Building, Marwan had the exclusive right to make decisions about the building. He provides no evidence that he was unable to exercise that right.

Finally, Marwan asks that the transfer of the Chatterton Building be viewed as "a formal, written declaration of trust, or an express reservation of life use." See Marwan Mem. at 16. However, Marwan provides no authority supporting his contention that we may simply ignore

24

Marwan's legal ownership interest and we are aware of none.

Accordingly, to the extent Subhi is found liable in tort or under the Fair Housing Actions for his actions related to his dealings with plaintiffs in the operation of the Chatterton Building, Marwan is vicariously liable as the principal.

## III. CONCLUSION

For the reasons stated above, this Court grants in part and denies in part Plaintiffs' partial motion for summary judgment (Docket # 121), and denies Defendant Marwan's motion for summary judgment (Docket # 125).

SO ORDERED.

Dated: December 18, 2018

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge